UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                  :

UNITED STATES OF AMERICA          :

                                    :

              -v.-                :           06 Cr. 46 (GEL)

                                    :

DAVID GONZALEZ,                :         **OPINION AND ORDER**

                                    :

                        <u>Defendant</u>.       :

                                    :
-------------------------------------------------------------x

Thomas H. Nooter, Freeman Nooter & Ginsberg,
New York, New York, <u>for defendant</u>.

Elie Honig, Assistant United States Attorney
(Michael J. Garcia, United States Attorney for the
Southern District of New York, on the brief), New
York, New York, <u>for the United States</u>.


GERARD E. LYNCH, <u>District Judge</u>:

       Indicted for conspiracy to distribute four kilograms or more of cocaine, defendant David

Gonzalez entered a plea of guilty before United States Magistrate Judge Gabriel W. Gorenstein

on August 22, 2006, pursuant to a written plea agreement. The plea was duly accepted by this

Court on August 31, 2006. On January 18, 2007, Gonzalez moved to rescind the plea agreement,

without withdrawing his guilty plea, claiming that he never fully understood the agreement.

Following an evidentiary hearing on the motion on January 26, January 31, and February 1,

2007, the motion will be denied.

I.     **Factual Background**

       The following facts were developed in a prior evidentiary hearing on Gonzalez's motion

to suppress evidence, except where otherwise noted. On January 10, 2006, a truck delivered

some 200 kilograms of cocaine from Texas to Gonzalez's storage units at a storage facility in

Pennsylvania; another truck from New York arrived later to retrieve the drugs.  Law enforcement agents who had surveilled Gonzalez's storage operation frustrated the transaction, seized the drugs, and arrested Gonzalez and the drivers of the trucks.  (7/7/07 Tr. at 3-4.)  In a subsequent search of Gonzalez's home, agents recovered a number of firearms (7/7/07 Tr. at 14-15) — according to the presentence report prepared in this case, there were more than 30 firearms altogether, including machine guns and a grenade launcher.  (Presentence Report at 3.)

## II.    The Indictment

Gonzalez was charged in a two-count indictment with conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession of firearms in furtherance of that conspiracy, in violation of 18 U.S.C. § 924(c).  These charges carry serious sentencing consequences.  The statutory penalties for the drug conspiracy charge include imprisonment for any term of years up to and including life imprisonment, and a mandatory minimum term of ten years, see 21 U.S.C. § 841(b)(1)(A), and the firearms charge requires at the minimum a mandatory five-year prison term, 18 U.S.C. § 924(c)(1)(A), which the law requires to be made consecutive to any sentence imposed on the narcotics count.  18 U.S.C. § 924(c)(1)(D)(ii).  Thus, if convicted on both counts, Gonzalez faced a prison term of at least 15 years, and at most imprisonment for life.  Moreover, because of the huge quantity of cocaine the distribution of which was the object of the charged conspiracy, if Gonzalez were convicted of both counts after trial, the United States Sentencing Guidelines would result in a recommended sentence of 235 to 293 months of imprisonment for the narcotics conspiracy, see U.S.S.G. § 2D1.1(c)(1), to be followed by the statutorily required consecutive sentence of 60 months on

the gun charge, for a total Guidelines recommendation of 295 to 353 months — in plain English, a minimum recommended sentence of nearly 25 years.

**III.    <u>The Plea Agreement</u>**

Although Gonzalez admits to conspiring to distribute the 200 kilograms of cocaine, he contends that his gun collection was just that — a collector's hobby — and was unrelated to the narcotics conspiracy.  In order to permit him to accept responsibility for the narcotics crime but contest the relevance of the firearms, his retained attorney, B. Alan Seidler, negotiated a somewhat complex plea agreement.

Under the agreement, Gonzalez was permitted to plead guilty to the narcotics conspiracy in return for dismissal of the firearms count.  (Letter from Assistant United States Attorney Elie Honig to Alan Seidler, Esq., dated Aug. 11, 2006 (the "Plea Agreement").)  The parties stipulated that the conspiracy concerned in excess of 150 kilograms of cocaine (resulting in a base offense level of 38, <u>see</u> U.S.S.G. § 2D1.1(c)(1)), and that Gonzalez would receive credit for timely acceptance of responsibility (which would reduce his offense level by three, to level 35, <u>see</u> U.S.S.G. § 3E1.1(b)).

However, the parties agreed to disagree about whether the possession of the firearms was in furtherance of the conspiracy, and should therefore be treated as relevant conduct.  <u>See</u> U.S.S.G. § 1B1.3 (defining relevant conduct).  If the Court accepted the Government's contention that it was, the resulting two-level enhancement, <u>see</u> U.S.S.G. § 2D1.1(b)(1) (increasing offense level where a narcotics offender possesses "a dangerous weapon (including a firearm)" in furtherance of the conspiracy), would lead to a total offense level of 37 and a recommended sentence between 210 and 262 months.  If the Court rejected the Government's

3

view, in contrast, the total offense level would be at most 35, with a recommended sentencing range of 168 to 210 months. Moreover, rejection of the firearms enhancement would have an additional beneficial consequence for Gonzalez. Possession of a firearm "in connection with the [drug] offense" would disqualify Gonzalez from eligibility for the statutory "safety valve" provided by 18 U.S.C. § 3553(f), thus cementing applicability of the mandatory ten-year minimum sentence for the drug conspiracy. But if Gonzalez did not possess a firearm in connection with the narcotics conspiracy, as the plea agreement expressly recognized, Gonzalez would be free to argue that he met the requirements for the statutory safety valve and the corresponding two-level reduction in the Guidelines calculation. (Plea Agreement at 2-3 & nn.1&2.) See U.S.S.G. §§ 2D1.1(b)(9), 5C1.2(a). If he did so qualify — and the parties did not stipulate as to whether he met all the other criteria, so this matter was open to contest in sentencing proceedings – his total offense level would further drop to 33, resulting in a recommended sentencing range of 135 to 168 months. In addition, the mandatory ten-year minimum would not apply.[1]

---

[1] The potential benefit to Gonzalez of the application of the statutory safety valve is open to question. It is arguable that where the safety valve applies, the Supreme Court's holding in United States v. Booker, 543 U.S. 220 (2005), would leave the Court free to impose a sentence of less than 120 months — indeed, in principle, even a sentence of probation — if the sentencing factors that the Court is required to consider under 18 U.S.C. § 3553(a) indicated that such a sentence was the penalty "sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in § 3553(a)(2). At least one Court of Appeals has held, however, that the language in § 3553(f) directing the sentencing court, where the safety valve applies, to "impose a sentence pursuant to [the] guidelines" in effect substitutes the lowest sentence permitted by the Guidelines (presumably including any departures that were permissible within the mandatory guidelines system itself, see 18 U.S.C. § 3553(b)), for the ordinary statutory mandatory minimum, and that the Supreme Court's Booker holding therefore does not apply. See United States v. Cardenas-Juarez, 469 F.3d 1331, 1334-35 (9th Cir. 2006) (holding that despite its mandatory language, 18 U.S.C. § 3553(f) survives Booker, and if triggered requires district courts to impose sentences according to the advisory Sentencing

4

Finally, the plea agreement renounced the parties' rights to argue for any other Guidelines adjustments or departures, or for a non-Guidelines sentence. The limited present record does not disclose any plausible potential Government arguments for a sentence above the recommended guidelines range that would be foreclosed by this provision. Gonzalez asserts, however, that if released from his bargain, he would argue for a minor role adjustment, as well as for potential departures (or, presumably, a non-Guidelines sentence authorized by <u>Booker</u>), based on certain health problems and evidence suggesting he may have been under some coercion or pressure to participate in the offense. Although at this stage of the case the Court cannot assess how plausible these arguments would be, if successful they could have a significant impact on Gonzalez's sentence. If Gonzalez were found to be, as he contends, a minor participant in the offense, the Guidelines would provide both for a reduction in his base offense level by four levels, and for a further two-point role reduction. <u>See</u> U.S.S.G. §§ 2D1.1(a)(3), 3B1.2(b). Thus, if Gonzalez were to prevail on all potentially contested guidelines issues (the firearms issue, the safety valve, and the minor participant issue), the

---

Guidelines).

Whatever merit this argument might have where the Guidelines sentence is *below* the ordinary statutory minimum, it is difficult to square with <u>Booker</u> the idea that facts found by the sentencing judge without a jury, in connection with calculating a Guidelines score and finding eligibility for sentencing treatment intended to mitigate the harshness of a statutory mandatory minimum, could have the paradoxical effect of *increasing* the statutory minimum sentence when the Guidelines result in a total score that is *above* the usual mandatory sentence. (As a practical matter, moreover, it would be a very unusual case indeed in which a sentencing judge would impose a sentence lower than ten years in a case in which the Guidelines recommendation exceeded that amount even after the Guidelines safety valve reduction has been applied, and where, as here, the parties have stipulated — albeit in a provision that does not bind the sentencing court — that no additional adjustments, departures, or § 3553(a) factors would warrant a sentence below the Guidelines recommendation.) In any event, the Second Circuit has not addressed the meaning of § 3553(f) in this situation, and there is no need at this time for the Court to resolve the question.

ultimate offense level would be 27, carrying a recommended range of 70 to 87 months, with the potential for further departures. By eschewing these additional arguments, the plea agreement gave up potential benefits to Gonzalez — although the practical cost of these concessions of course depends entirely on the extent to which any of the foregone arguments were likely to succeed.

Given his conceded (and presumably indisputable) guilt of narcotics conspiracy, Gonzalez thus faced two principal alternatives. His first choice was to accept the proposed plea agreement. By doing so, Gonzalez would give up sentencing arguments he might have otherwise made (arguments whose chances of success might, of course, have been slight). He would face a likely guideline recommendation of somewhere between 135 months (the bottom of the applicable range if he prevailed on the firearms and safety valve issues that the agreement permitted him to contest) and 262 months (the top of the range that would apply if he lost on all those issues) — or more realistically 210 months (the bottom of that range). However, doing so would lock in certain benefits, which can best be appreciated by considering the risks of the alternative course of action.

Gonzalez's second alternative was to reject the plea agreement. Under this strategy, he could still plead guilty to the conspiracy charge. He would still face trial on the firearms count, however, and if convicted he would risk losing any credit for acceptance of responsibility, as well as facing the more drastic consequences of conviction of the separate firearms crime instead of the guideline firearm adjustment.[2] That is, the worst-case scenario under this alternative was

_____

[2] For an interesting discussion of the possible applicability of the acceptance of responsibility provision of the Guidelines in this situation, see United States v. Hargrove, ___ F.3d ___, 2007 WL 547745 (4th Cir. Feb. 23, 2007).

the 353-month top of the guideline range (or, more realistically, the 295-month bottom of that range). This alternative, however, also opened up other possibilities potentially less disastrous for Gonzalez. Perhaps the Government would choose to avoid the trouble of a jury trial on the firearms charge, and simply present its facts at a sentencing hearing. Or perhaps, given the more demanding burden of proof at a jury trial, Gonzalez could secure an acquittal on the firearms count of the indictment. In this case, however, he might still face the risk that the firearms would be found relevant at sentencing, either as relevant conduct if the Court found them to be so under the less demanding burden of proof at a sentencing hearing, or — even if they were not possessed in furtherance of the conspiracy — if the Court concluded that the possession of such weapons (at least some of which apparently were not lawfully possessed) indicated a need to protect the community warranting a sentence high in the otherwise-applicable guideline sentencing range.

In short, the decision whether to accept the plea agreement involved a bewildering array of possible scenarios and consequences. One way or another, Gonzalez would face severe sentencing consequences for his admitted guilt of narcotics conspiracy, and would face a determination by either a judge or jury regarding the relationship of his arsenal of weapons to that conspiracy. But whether the agreement's benefits in limiting the consequences of the worst-case scenarios outweighed its costs in giving up arguments that in theory could lead to better outcomes depends on the evaluation of the relative likelihood of the various possible favorable and unfavorable outcomes.

## IV.   **The Guilty Plea**

On August 22, 2006, Gonzalez appeared before Judge Gorenstein to proffer his plea of guilty.  After being placed under oath, Gonzalez, a 43-year old United States citizen who attended high school to his senior year (though apparently without graduating), professed to be satisfied with his attorney and to have had a "full opportunity to discuss this case with him." (8/22/06 Tr. 3-4.)  With respect to the potential sentencing consequences of his plea, Judge Gorenstein was quite thorough.[3]  Judge Gorenstein advised Gonzalez (and Gonzalez said that he understood) that his guilty plea to the narcotics charge exposed him to the possibility of life imprisonment, and to a mandatory minimum ten-year term.  (Id. at 5.)  He also advised Gonzalez that the decision as to the appropriate sentence would be "entirely up to the sentencing judge," who would be limited only by "what the law requires," and Gonzalez again professed to understand what that meant.  (Id. at 8.)  Gonzalez, who had signed the plea agreement, affirmed that he had read it and discussed it with counsel before signing it, and that his attorney had "explain[ed] to [him] all of its terms and conditions."  (Id. at 9.)

Judge Gorenstein then undertook to assure himself that Gonzalez understood the salient terms of the agreement.  He noted that "the agreement states the conclusion that the guideline sentencing range can be expected to be from 210 to 262 months,"[4] expressly repeated that the

_____

[3] Judge Gorenstein also thoroughly advised Gonzalez of the nature of the offense charged and the rights that he was waiving by entering a guilty plea.  As these portions of the allocution are not germane to the present motion, they will not be further summarized here.

[4] The complexity of plea agreements such as this, and the interrelation of the Guidelines with mandatory minimum sentences that under certain conditions may become less than mandatory, pose daunting problems for judges trying to assure that defendants understand the sentencing consequences of their pleas.  In this instance, moreover, the agreement itself is expressed in ways that may obscure its provisions at first glance.  Judge Gorenstein here chose to emphasize something of a worst-case interpretation of the agreement, advising Gonzalez that the guideline range "can be expected to be" between 210 and 262 months.  This range, which

sentencing judge would not be bound by this analysis, and further explained that the guidelines range was in any event "just one of many factors that the judge will consider in determining your sentence, and that you may be sentenced to a term of imprisonment either below or above the range, anywhere up to the maximum sentence . . . of life imprisonment."  Gonzalez indicated that he understood all of that, and also understood that under the agreement he was waiving his right to appeal any sentence that was less than 262 months.  (Id. at 9-10.)

Judge Gorenstein then asked if Gonzalez had questions about his understanding of the plea agreement.  Gonzalez raised a question "[i]n regard to just the understanding that the enhancement that I am being faced with."  (Id. at 11.)  Gonzalez's attorney, Seidler, at that point raised the "carve-outs" in the agreement, reminding the judge that "[t]here is a carve-out in the agreement with regard to the weapon issue, [the] weapon enhancement," and "the safety valve issue as well."  Judge Gorenstein then advised Gonzalez that "there's going to be discussions about whether that's in fact the correct sentencing range because your attorney is going to make certain arguments.  However, . . . if your attorney loses the arguments or whatever else happens, no matter what, if you get 262 months or less, you can't appeal it.  You can only appeal it if the sentence is more than 262 months."  Judge Gorenstein then asked Gonzalez if he understood, or if he needed more time to talk to his attorney.  Gonzalez replied, "No, I don't understand that.  I need to talk to my attorney."  (Id. at 11.)

--------

reflects the stipulated guideline range *if the Government prevails on the firearms issue*, is the stipulated guideline range highlighted by the agreement's text.  The agreement then goes on to note, in a footnote and in subsequent text, that the parties have agreed that Gonzalez would be entitled to dispute that portion of the guideline calculation that rested on the firearms enhancement, and that if he prevailed he would be entitled to argue for application of the safety valve as well.  See Plea Agreement at 2-3 & nn.1&2.

The transcript then indicates a "pause" of unspecified duration, after which Gonzalez indicated that he was ready to proceed.  Judge Gorenstein then repeated that "no matter what arguments your attorney makes, whether he's successful or unsuccessful, under this agreement, if you g[e]t a sentence of 262 months or less, you cannot appeal that sentence."  (Id. at 12.) Gonzalez indicated that he understood that, as well as understanding the further point that he would not "be able to go back to the [sentencing] judge afterwards through, for example, a petition for a writ of habeas corpus and seek to change the sentence that way either."  (Id.) Asked by the judge whether he had any further questions "about what I just told you," Gonzalez answered, "No, sir."  (Id.)

After additional questioning with respect to the voluntary nature of the plea, Gonzalez admitted to having been "involved in" storing "5 kilograms or more of cocaine," as a result of "an understanding with other people," between May of 2005 and January 2006, to being present when cocaine was unloaded, and to locking the cocaine in the storage unit until others came to retrieve it.  (Id. at 13-15.)  Sentencing was scheduled for November 17, 2006.  (Id. at 16.)

**V.      The Present Motion**

On September 19 and 20, 2006, the Court received letters from Seidler and from Gonzalez, advising the Court that Gonzalez had "fired" his attorney and wished the Court to appoint new counsel for him.[5]  On September 29, after verifying with Gonzalez that he did indeed want to discharge  Seidler, and after determining that Gonzalez qualified for appointed

---

[5] Gonzalez had originally been represented by a different attorney, Sanford N. Talkin, who had been appointed under the Criminal Justice Act by the presiding Magistrate Judge at the time Gonzales was arrested in January 2006.  Seidler entered an appearance as retained counsel on March 15, 2006.

counsel, the Court relieved Seidler and appointed Thomas H. Nooter to represent Gonzalez.

Nooter first sought adjournment of the sentencing date, which was granted, and then on January

18, 2007, filed the instant motion to rescind the plea agreement, albeit not to withdraw the plea

of guilty.  The motion was predicated on an affidavit from Gonzalez, which affirmed under oath

that his former attorney, Seidler, "in an attempt to convince me of taking [*sic*] the offer on the

plea agreement," "guaranteed me that I'd only do 3 to 4 years in prison, . . . according to the

[Sentencing Guidelines] in regards to first time offenders with minor roles."  (Gonzalez Aff. ¶ 3.)

Gonzalez further averred that he "was troubled and had difficulty [in] coming into . . .

understanding of the plea agreement," but relied on his attorney's promises in accepting the

agreement.  (Id. ¶ 5.)  He stated that he told Judge Gorenstein that he had not been coerced or

made promises in response to  Seidler's coaching him to do so, conveyed via nods of the head

(id. ¶ 6), and that he eventually advised the judge that he understood the sentence terms and

appellate waiver because Seidler had similarly "nodded his head, signaling me to say yes" (id.

¶ 12).  Gonzalez also averred that his attorney never "explained to me all of my constitutional

rights I was waiving by entering a plea of guilty" (id. ¶ 7), that he "never understood to the

fullest extent" the maximum and minimum terms of imprisonment (id. ¶ 8), that he was

"troubled and confused at the 210 to 265 months term of imprisonment stated on the plea

agreement" (id. ¶ 10), that he did not understand the drug quantity that he was acknowledging in

the plea agreement (id. ¶¶ 10, 13, 14, 16), and that he would not have pled guilty had he known

he was giving up "certain appel[l]ate rights" without understanding "the plea agreement to the

fullest extent" (id. ¶ 15).

In response, the Court held an evidentiary hearing at which Gonzalez and Seidler both testified.

## VI.   <u>Governing Law</u>

The Second Circuit recently addressed the somewhat unusual situation in which a defendant seeks to withdraw not his guilty plea, but his assent to a plea agreement.  <u>United States v. Lopez</u>, 385 F.3d 245 (2d Cir. 2004).  The Court there pointed out that while Rule 11 of the Federal Rules of Criminal Procedure provides direction containing the withdrawal of a guilty plea itself, it does not expressly address a request to withdraw from a plea *agreement* without withdrawing the plea.  <u>Id</u>. at 250-51.  The Court concluded that such requests to rescind could be entertained, but "should not simply be granted upon request."  <u>Id</u>. at 253.  Rather, the same "fair and just reason" standard set for withdrawal of a plea by Rule 11(d)(2)(B) should be applied to such applications.  <u>Id</u>.  In particular, the Court instructed district courts to consider "whether there is credible evidence that the defendant did not freely and voluntarily enter into the plea agreement, either because he was coerced or improperly induced to accept its terms, or because he misunderstood them."  <u>Id</u>. at 255.  The Court also advised district courts to consider whether the Government would suffer any prejudice, although it cautioned that that factor should be given less importance.  <u>Id</u>.

## VII.   <u>Factual Findings</u>

It must be observed at the outset that our sentencing law is sufficiently complex to confuse experienced lawyers, and that it would be a tall order for a defendant with less than a high school education and no previous significant involvement with the criminal justice system to understand the advantages and disadvantages of a proposed plea agreement such as the one in

this case.  In order to decide whether the plea agreement was in his interests, Gonzalez was asked to comprehend such unusual — and largely counter-intuitive — propositions as the following:

(1) The charge of possessing a firearm in furtherance of a drug conspiracy was being dropped, but the judge would nevertheless decide at the time of sentence whether Gonzalez had indeed so possessed a firearm, and an affirmative finding could result in a dramatic increase in sentence, albeit not quite as dramatic as if he had been convicted of the dropped charge.

(2) The narcotics conspiracy charge carries a mandatory minimum sentence of ten years in prison, quite apart from the firearm count, but because the mandatory sentence would no longer be mandatory if a five-factor "safety-valve" test was met, and because one of those factors was not possessing a gun in connection with the offense, the firearm issue was actually the key to permitting a sentence below the mandatory minimum on the narcotics charge.

(3) Nevertheless, qualifying for exemption from the mandatory minimum sentence would not necessarily result in a sentence below the mandatory minimum, because the Sentencing Guidelines would most likely recommend a sentence in excess of the minimum anyway.

(4) These Guidelines, unlike the mandatory minimum sentence which may or may not be mandatory, are *not* mandatory, and in this Circuit aren't even "presumptively" to be followed, see United States v. Fernandez, 443 F.3d 19, 28 (2d Cir. 2006), although the Supreme Court just might decide, at a time before Gonzalez is finally sentenced, that they *are* presumptively to be followed, see Rita v. United States, No. No. 06-5754, 127 S. Ct. 551 (Nov. 3, 2006) (order granting certiorari on the question of, inter alia, whether it is consistent with Booker to award a presumption of reasonableness to within-Guidelines sentences).  However, a sentence outside the

13

guidelines range has a higher chance of being reversed than a sentence within the range, and judges usually follow them.[6]

(5) By signing the agreement, Gonzalez was stipulating to a particular guideline calculation, but that the stipulation had certain "carve-outs" allowing him to argue that the stipulated guideline calculation actually *wasn't* the correct guideline calculation after all. However, the parties *were* absolutely stipulating to the accuracy of those aspects of the guideline calculation that weren't subject to specific carve-outs.

(6) Even as to those aspects of the guideline calculation that the parties agreed on, the sentencing judge actually was free to conclude that the parties were both wrong, and that the correct guideline calculation was something else entirely.  Moreover, because the Guidelines aren't mandatory (except that the judge is extremely likely to follow them, see point (4)), the judge could agree with the stipulated guideline sentence and *still* impose a sentence higher or lower than the recommended range.

(7) Even though the agreement stipulated that Gonzalez was not entitled to a minor role reduction or to a departure based on certain facts, the judge's power to impose a non-Guidelines sentence means that defense counsel — so long as he didn't actually *ask for* a departure — could, in the guise of laying out arguments for a sentence at the bottom of the guideline range, put before the sentencing judge the *facts* that arguably support a role reduction or departure.  In

---

[6] Statistically, judges around the country impose sentences within the guidelines range in 86.3 % of cases in which the Government does not affirmatively move for a below-Guidelines sentence.  United States Sentencing Commission, Federal Sentencing Statistics, Fiscal Year 2006, at 11, available at http://www.ussc.gov/JUDPACK/2006/2c06.pdf

other words, counsel could indirectly lay the groundwork for the Court on its own volition to grant a lower sentence on grounds the plea agreement stipulated were not applicable.

(8) One benefit of the plea agreement is that Gonzalez would secure a reduced guideline recommendation based on acceptance of responsibility even though he was admitting only to the drug conspiracy but contesting the connection of the guns to the drugs, but if he did not sign the agreement, and nevertheless pled guilty to the conspiracy count while going to trial on the count alleging that the guns were connected to the drugs, he might of might not receive credit for accepting responsibility.

(9) Even though the Sentencing Guidelines are designed to reduce sentencing disparity between different offenders on similar facts, and to provide predictable, relatively fixed sentences, and even though the basic facts of this case (essentially, that Gonzalez agreed to store a large shipment of cocaine at his Pennsylvania storage unit to facilitate its transfer from the Texas wholesalers to the New York retailers, and that he had a small arsenal of guns in his home, which was at a different location from the storage facility) are essentially undisputed, the guideline calculations (totally apart from any discretionary authority the Court might have to sentence outside the Guidelines) could result in a sentence anywhere between 11 years in prison and nearly 30 years based on such subtle considerations as whether the judge thought that the guns were "connected with" the drug offense, U.S.S.G. § 2D1.1, Application Note 3, and whether his role in the conspiracy made him "substantially less culpable than the average participant" in such a conspiracy, id. § 3B1.2, Application Note 3(A).

Moreover, in order to make an intelligent decision as to whether the plea agreement was in his interests or not, a defendant in Gonzalez's position would have to assess, in the face of

15

some uncertainty as to just how much evidence the Government possessed, the likelihood that the Government would insist on trying the firearms charge if he simply pled to the narcotics charge without benefit of an agreement; whether he would be able to convince a judge or jury, under different standards of proof, to doubt the Government's claim that the guns played some role in his involvement in the drug conspiracy; whether he really did or did not have a realistic prospect of persuading a judge that his role in the conspiracy should be characterized as minor, or of obtaining a departure or non-Guidelines sentence based on his claims of poor health and coercion; and whether any of these calculations might be affected by anticipated decisions of the Supreme Court, or by a particular judge's interpretation of various open legal issues.

In the face of such complexities, it would hardly be surprising if a defendant of ordinary intelligence felt less than confident that he understood the alternatives available to him and was able to make an intelligent choice among them. Patient, lengthy meetings between a client and a sympathetic lawyer, skilled both in understanding the complexities of the law and explaining them to an anxious lay person, are absolutely necessary if defendants are to be adequately advised.

Determining what a defendant understood or did not understand about these legal complexities is not helped when that defendant is as determined as Gonzalez is to exaggerate his ignorance. Gonzalez does not contend that he was puzzled over the intricacies of the agreement. Instead, he flatly testifies that Seidler misled him about his sentencing exposure by "guaranteeing" a sentence dramatically below the express terms of the agreement. Gonzalez's claim that he signed a plea agreement that prominently asserted that "the defendant's sentencing range is 210 to 262 months" (Plea Agreement at 3) only because his lawyer "guaranteed" him

16

that he would serve no more than three to four years in prison (Gonzalez Aff. ¶ 3) is incredible on its face.  Gonzalez, whom the Court has observed on numerous occasions during the pendency of this case, and who testified at some length on this motion, is a native English-speaker who can read and write, and he is manifestly neither unintelligent nor delusional.  The Court cannot credit his testimony that he simply accepted any such "guarantee," in the face of the clear words of the plea agreement, even in the unlikely event that an experienced lawyer such as Seidler would have expressed it.

Gonzalez's testimony at the hearing was similarly dubious.  Even when addressing his present understanding of the agreement and of his present legal position, after whatever explanations he received from Seidler, the explanations of Judge Gorenstein, and the advice of his present counsel, Gonzalez insisted that he failed to understand aspects of his situation that are *not* complex and that a person of average intelligence should not have difficulty with.  For example, at the very outset of his testimony, asked what about the agreement he took issue with, Gonzalez insisted that he did not "agree with . . . the enhancement on the weapons possession." (1/31/07 Tr. 4.)  Asked by his own lawyer whether he understood that the agreement preserved his right to object to this enhancement, he said yes, but then insisted that "I just don't feel that the weapons are part of the situation.  I[t] wasn't explained properly.  I didn't understand."  (Id.) Gonzalez's demeanor, and overall testimony, gave no indication of stupidity; his manner of answering convinced the Court that he essentially preferred or pretended not to understand this key aspect of the agreement.  Similarly, Gonzalez claimed to believe, as of the time of the hearing, that the agreement took away his right to appeal "[a]ltogether."  (Id. at 6.)  Once again,

the true scope of the appeal waiver was accurately and fully described to him by Judge

Gorenstein.  It is impossible to believe that Gonzalez was testifying truthfully.

In contrast, the Court accepts Seidler's testimony as credible.  Seidler was candid in

expressing his concerns with his client's truthfulness, in acknowledging lapses of memory, and

in describing occasionally rushed conferences with his client.  Moreover, Seidler's testimony

accords with what Gonzalez himself told Judge Gorenstein at the plea allocution.

The Court finds that Seidler fully explained the plea agreement to Gonzalez before

Gonzalez pled.  The Court credits Seidler's testimony that he met with Gonzalez for purposes of

explaining the agreement at least three times, on August 14, 15 and 18, in addition to having

discussed the general options for negotiating a plea and the terms being discussed with the

Government "many times" before that.  (2/1/07 Tr. 62-63.)  During those meetings, counsel went

through the agreement "essentially word for word," specifically discussing the guidelines range

stated in the agreement, the drug amount to which Gonzalez would be stipulating and the

statutory maximum and minimum sentences.  (Id. at 63.)  Seidler explained the appeal waiver

and the carve-outs permitting the defense to raise certain objections at the time of sentence, and

did not tell Gonzalez that the agreement provided for a sentence of 3 to 4 years, although he did

tell him that he could get a sentence below what the agreement called for if he succeeded at the

hearing in establishing his safety valve eligibility.  (Id. at 63-65.)

Moreover, the Court further credits Seidler's testimony that the real problem was not that

Gonzalez did not understand the terms of the agreement, but that he was not happy with it and

had trouble understanding, as anyone might, how a charge dismissed as a separate count could

nevertheless resurface as relevant conduct at sentencing on another charge.  (Id. at 65-66.)  But

18

failing to understand the justice or logic of sentencing law is not the same thing as failing to understand the terms of the agreement or the consequences of signing it.  Gonzalez understood the agreement well enough to argue with his attorney about every term of the agreement.  (Id. at 66.)  In the end, although unhappy with the Government's stringent terms, Gonzalez decided "to take the plea agreement."  (Id.)

These findings about the discussions between Gonzalez and his attorney in preparation for the guilty plea allocution are entirely consistent with Gonzalez's own representations to the Magistrate Judge in open court.  Contrary to his later professions, Gonzalez told Judge Gorenstein, under oath, that he understood the maximum and minimum sentences he faced, which is unsurprising since Judge Gorenstein explained them in clear and certain terms (8/22/06 Tr. 5), as Seidler had already done.  Gonzalez also stated that he understood that the sentencing judge would be limited only by those statutory limits, and that he had received no promises about what his sentence would be.  (Id. at 8.)  Again, this sworn testimony is fully consistent with what Seidler says he told Gonzalez in advance, and with what Judge Gorenstein told him at the allocution, and entirely inconsistent with Gonzalez's claim that a secret promise had been made to him.  He swore to the judge, again consistent with what he had been told by Seidler in advance, that he knew and understood that the agreement exposed him to a possible guidelines range of 210 to 262 months.  (Id. at 9.)

The starkest contradiction between Gonzalez's and Seidler's testimony concerns the allocution itself.  Gonzalez claims that Seidler told him virtually nothing about what would happen at the allocution, simply instructing him to "say yes to everything the judge asks." (1/31/07 Tr. 20.)  In fact, of course, some of Judge Gorenstein's questions elicited negative

answers, a fact Gonzalez explains by saying that Seidler coached him by nodding or shaking his

head.  (Id. at 21.)  Seidler flatly denies that he gave Gonzalez such instructions, or that he

coached Gonzalez with nods.  (2/1/07 Tr. 67-68.)  It is highly unlikely that the experienced

Magistrate Judge would have failed to notice the kind of blatant coaching and robot-like

responses that Gonzalez claims occurred.  What makes Gonzalez's testimony particularly

incredible is that when Gonzalez did encounter a question about which he was unsure — on the

subject of the appeal waiver — he told the judge of his problem, and asked to speak to his

attorney.  (8/22/06 Tr. 11-12.)  The witnesses totally disagree about what was said during this

colloquy.  According to Gonzalez, Seidler provided no additional information, simply repeating

that Gonzalez should "Just say yes to everything the judge is asking you as I instructed you."

(1/31/07 Tr. 23; see also id. at 24.)  Seidler not only contradicted this testimony, but did so in a

manner that conveys his highly credible exasperation with Gonzalez:

> I explained to him exactly what was in the plea agreement.  As a
> matter of fact, I remember being annoyed frankly — I was
> annoyed that he said that he didn't understand it because I had
> gone over it with him over and over again at the jail and that there
> was an appellate waiver of a sentence of 262 months or less over
> and over again.  And when the plea stopped at that time I didn't
> really understand the basis for it.

(2/1/07 Tr. 69.)  Despite his frustration, Seidler proceeded to "re-explain to [Gonzalez] the

nature of the appellate waiver right there in the proceedings.  (Id.)  Seidler's testimony rings

true; Gonzalez's does not.

Gonzalez's present attorney concedes, as any rational person must, that Seidler "was

much more accurate in his recollections of what transpired between him and Mr. Gonzalez"

(Letter of Thomas H. Nooter, Esq., to the Court, dated Feb. 23, 2007, at 1), and that it is "not

likely that Mr. Seidler repeatedly made a promise that the sentence would be in the three to four year range" (id. at 2).  Counsel does not attempt to argue that Gonzalez told the truth.  Instead, he contends only that Gonzalez had a "relatively shallow understanding of what are rather sophisticated concepts."  (Id. at 1.)  Deep or shallow, however, the fact is that Gonzalez understood the terms of the agreement.  He consciously, freely and voluntarily — albeit under the compulsion of adverse facts, harsh laws, and lack of desirable alternatives — accepted those terms.  He was not coerced or improperly induced to accept the agreement.  In short, there is no just cause for him to be relieved of an agreement that he freely accepted.

## CONCLUSION

Accordingly, for the reasons set forth above, defendant's motion to rescind his plea agreement is denied.

SO ORDERED.

Dated:  New York, New York
          March 23, 2007

GERARD E. LYNCH
United States District Judge

21